**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 7, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JACK ULREY,

          Petitioner-Appellant,

v.

ARI ZAVARAS, Executive Director, Colorado Department of Corrections; ANGEL MEDINA, Warden, Limon Correctional Facility; JOHN SUTHERS, Attorney General, State of Colorado,

          Respondents-Appellees.

No. 12-1010
(D.C. No. 1:10-CV-02530-MSK-MEH)
(D. Colo.)

---

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]

---

Before **BRISCOE**, Chief Judge, **MCKAY** and **HOLMES**, Circuit Judges.

---

Jack Ulrey, a Colorado state prisoner proceeding pro se,[1] seeks a certificate of

---

[*]      This Order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

      After examining the appellate record, this three-judge panel determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

[1]      Because Mr. Ulrey is proceeding pro se, we construe his filings liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Van Deelen v. Johnson*, 497 F.3d 1151, 1153 n.1 (10th Cir. 2007).

appealability ("COA") to challenge the district court's denial of his application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Mr. Ulrey has also filed a motion to proceed *in forma pauperis* on appeal. Having thoroughly considered the relevant law and the record, we deny Mr. Ulrey's application for a COA and dismiss this matter. We nonetheless grant his motion to proceed *in forma pauperis*.

## I. BACKGROUND

In January 2003, on the advice of counsel, Mr. Ulrey entered a global plea agreement in three separate criminal cases pending in Colorado state court. In the first case, number 01CR1293, he pleaded guilty to attempted first-degree assault and a crime-of-violence enhancement. In the second case, number 01CR2633, he pleaded guilty to possession of a schedule II controlled substance and a special-offender enhancement. In the third case, number 01CR1739, he pleaded guilty to attempted first-degree murder and a crime-of-violence enhancement. The district attorney agreed to recommend a sentencing range for Mr. Ulrey's crimes of thirty to fifty years, which would encompass all three cases.

Prior to sentencing, Mr. Ulrey sought to withdraw his guilty plea pursuant to Colorado Rule of Criminal Procedure 32(d), "claiming that he did not have the cognitive functioning necessary to understand the complex plea agreement." ROA, Vol. 1, at 606 (*People v. Ulrey*, No. 06CA0827 (Colo. App. July 15, 2010)).[2] At a hearing, he presented

---

[2] We refer to the record on appeal by the abbreviation "ROA." We refer to the state-court record by the abbreviation "State R." When designating a particular

(continued...)

the testimony of a clinical neuropsychologist, a criminal defense expert, and his plea

counsel, Joan Heller. The state trial court denied the motion to withdraw and sentenced

Mr. Ulrey to a term of imprisonment of thirty-eight years for attempted first-degree

murder and twenty years each for attempted first-degree assault and possession of a

controlled substance, with all sentences to run concurrently. The Colorado Court of

Appeals ("CCA") affirmed.

Mr. Ulrey then filed a pro se postconviction motion pursuant to Colorado Rule of

Criminal Procedure 35(a), asserting that plea counsel was ineffective in advising him to

plead guilty. He alleged that Ms. Heller did not spend enough time on his three cases and

did not conduct an adequate investigation into each of them. Had she done so, he argued,

she could have developed viable defenses, including self-defense and the "make my day"

defense under Colorado law. Mr. Ulrey claimed he would have gone to trial but for

counsel's ill-informed recommendation to enter the plea.

Although the state trial court denied the Rule 35(a) motion, the CCA ordered a

limited remand to determine whether a hearing was appropriate. On remand, Mr. Ulrey

filed a twenty-eight-page offer of proof that described statements that various witnesses

gave or would give with respect to each of the three cases. Mr. Ulrey argued that plea

counsel was ineffective for failing to interview or follow up with these witnesses. He also

[2](...continued)
volume of the record, we use the numbering used by the respective records. Thus, the
single volume of the record on appeal is referred to as "ROA, Vol. 1," while the volumes
of the state-court record are designated by roman numerals (for example, "State R., Vol.
II").

pointed to the availability of forensic evidence in the third case (the conviction for attempted first-degree murder) that, in his view, supported theories of self-defense or the "make my day" defense. *See* State R., Vol II, at 335–62 (Def.'s Offer of Proof, filed Oct. 31, 2008). The state trial court denied an evidentiary hearing and postconviction relief, and the CCA affirmed. The CCA found that Mr. Ulrey failed to overcome the presumption that plea counsel made a reasonable, strategic decision in advising him to plead guilty, and that his offer of proof was not exculpatory and failed to show that the asserted defenses were viable. The court also rejected the claim that counsel spent inadequate time on the three cases.

Mr. Ulrey then sought habeas relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Colorado, raising the same claims of ineffective assistance that were asserted in his Rule 35(a) postconviction motion. A magistrate judge concluded that the CCA's decision was not contrary to or an unreasonable application of the Supreme Court's precedents—specifically, *Strickland v. Washington*, 466 U.S. 668 (1984), and *Hill v. Lockhart*, 474 U.S. 52 (1985)—and recommended denying habeas relief.

On September 6, 2011—twenty days after the magistrate judge issued his recommendation—habeas counsel for Mr. Ulrey, Alison Ruttenberg, moved for, and was granted, an extension of time to file objections to the recommendation. At the expiration of the new deadline (October 11), Ms. Ruttenberg filed a second motion for extension, which was also granted. The next new deadline, November 23, came and went, and no

4

objections were filed. On December 12, citing the failure to timely object, the district court summarily adopted the magistrate judge's recommendation and entered judgment denying relief. Mr. Ulrey filed a timely notice of appeal.

## II. DISCUSSION

**A. Waiver of Appellate Review**

Before proceeding, we must address Mr. Ulrey's failure to timely object to the magistrate judge's recommendation. In this Circuit, we adhere to a "firm waiver rule." *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008). A party who fails to object in timely fashion to the findings and recommendations of the magistrate judge "waives appellate review of both factual and legal questions." *Id.* (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)) (internal quotation marks omitted).

Although we call this rule "firm," we recognize three exceptions to it. First, when "a *pro se* litigant has not been informed of the time period for objecting and the consequences of failing to object," we excuse the failure to file objections. *Id.* (quoting *Morales-Fernandez v. INS*, 418 F.3d 1116, 1119 (10th Cir. 2005)) (internal quotation marks omitted). Second, we excuse a failure to object if the "interests of justice" necessitate our review. *Id.* (quoting *Morales-Fernandez*, 418 F.3d at 1119) (internal quotation marks omitted). Finally, the firm waiver rule is itself waivable or forfeitable. Thus, when an appellee fails to contest appellate review on firm-waiver grounds, we may hear the appeal despite the appellant's failure in the district court to object to the magistrate judge's recommendation. *See Hicks v. Franklin*, 546 F.3d 1279, 1283 n.3

5

(10th Cir. 2008) ("[T]he State did not raise Mr. Hicks' failure to file a timely objection in its argument on the merits issues. Because a failure to timely object to a magistrate's report is not jurisdictional, the State has forfeited any claim that we should not consider the appeal because of Mr. Hicks' failure to timely object." (citation omitted)).

We hold that the interests of justice necessitate our review of Mr. Ulrey's claims. The interests-of-justice exception is a free-floating one. We have called it "a rather elusive concept," and we look to factors such as "a *pro se* litigant's effort to comply, the force and plausibility of the explanation for his failure to comply, and the importance of the issues raised." *Duffield*, 545 F.3d at 1238 (quoting *Morales-Fernandez*, 418 F.3d at 1120) (internal quotation marks omitted). This list is nonexhaustive. Mr. Ulrey argues that we should excuse his failure to timely object because his habeas counsel, Ms. Ruttenberg, promised to file objections but then abandoned him without notice. We believe this kind of situation satisfies the interests-of-justice exception.

Ms. Ruttenberg wrote to Mr. Ulrey on September 21, 2011—after she was granted an extension of time to object, but before the expiration of the first new filing deadline on October 11. Her letter read, in pertinent part:

> Dear Jack:
>
> Unfortunately, the Magistrate recommended that the Judge deny your writ of habeas corpus. I asked for an extension of time to file objections, and an [sic] working on that now. . . . I will do my best on the objections and will send you a copy when this document is filed. Take care . . . .

Aplt. Mem. Br., filed Jan. 26, 2012, Att. 1. Unbeknownst to Mr. Ulrey, Ms. Ruttenberg

6

did not follow through on her promise to file objections, even after she sought and was granted a further extension. On January 5, 2012—long after her filing deadline had passed—Ms. Ruttenberg informed Mr. Ulrey that his appeal was over. *See* Aplt. Mem. Br. at 3. Only then did Mr. Ulrey learn that no objections had been filed.

Habeas counsel's failure to timely object to a magistrate's recommendation is not constitutionally deficient performance because, generally, there is no Sixth Amendment right to effective assistance of counsel in collateral proceedings. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012). Further, as a general matter, "when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight." *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012). There are circumstances, however, in which a petitioner should not bear the brunt of counsel's mistakes—when, for example, counsel "abandons his client without notice, and thereby occasions the default." *Id.* That is the situation here. In the interests of justice, we will not apply the firm-waiver rule when a habeas petitioner's failure to file timely objections is occasioned by counsel's unnoticed abandonment of the case. That is particularly true when, as in this case, counsel promised to file objections and then, unbeknownst to her client, failed to follow through. *Cf. id.* at 924 ("Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him.").

In every other respect, Mr. Ulrey appears to have diligently pursued remedies available to him. And when we first notified him that his COA application might be

7

dismissed on firm-waiver grounds, he responded promptly with a comprehensive pro se brief explaining the situation.  In our view, he has made a diligent "effort to comply," and we are satisfied with "the explanation for his failure to comply."  *Duffield*, 545 F.3d at 1238 (quoting *Morales-Fernandez*, 418 F.3d at 1120) (internal quotation marks omitted). We conclude that the interests-of-justice exception applies here, and we will proceed to the merits of Mr. Ulrey's COA application.[3]

**B. Standard of Review**

A COA is a jurisdictional prerequisite to our review of the merits of a habeas appeal.  *See* 28 U.S.C. § 2253(c)(1)(A); *accord Clark v. Oklahoma*, 468 F.3d 711, 713 (10th Cir. 2006) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).  We will issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To satisfy this standard, the applicant must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented

---

[3] A panel of this court has previously said that a claim of attorney abandonment does not satisfy the interests-of-justice exception to the firm-waiver rule. *See Smith v. SDI Indus., Inc.*, 260 F. App'x 93, 94–95 (10th Cir. 2008).  But we expressly limited our holding in *Smith* to its context: a "counseled, civil, *nonhabeas* case[]."  *Id.* at 94 (emphasis added) (quoting *Key Energy Res., Inc. v. Merrill*, 230 F.3d 1197, 1200 (10th Cir. 2000)) (internal quotation marks omitted).  By contrast, habeas cases, although civil in nature, are "unique."  *Sloan v. Pugh*, 351 F.3d 1319, 1323 (10th Cir. 2003) (quoting *Harris v. Nelson*, 394 U.S. 286, 294 (1969)) (internal quotation marks omitted).  Their roots being in criminal proceedings, they implicate liberty interests not at stake in traditional civil cases.  *See Smith v. Bennett*, 365 U.S. 708, 712 (1961) ("The availability of a procedure to regain liberty lost through criminal process cannot be made contingent upon a choice of labels.").  We therefore find our (nonprecedential) decision in *Smith* distinguishable.

were adequate to deserve encouragement to proceed further." *Harris v. Dinwiddie*, 642 F.3d 902, 906 (10th Cir. 2011) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) (internal quotation marks omitted). When, as here, the district court denies an application on the merits, the applicant carries his burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Warnick v. Booher*, 425 F.3d 842, 846 (10th Cir. 2005) (quoting *Slack*, 529 U.S. at 484) (internal quotation marks omitted).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings. *See Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011).[4] An applicant is not entitled to relief unless he can demonstrate that the state court's

---

[4] In his COA application, Mr. Ulrey argues that AEDPA is unconstitutional "on separation of powers grounds and on grounds of vagueness." Aplt. Combined Opening Br. and Appl. for COA at 6 [hereinafter "Appl. for COA"]. He did not assert this claim in his habeas application before the district court, and we would ordinarily deem it waived. *See Parker v. Scott*, 394 F.3d 1302, 1327 (10th Cir. 2005) ("Parker raises several other alleged failures of counsel to object at trial, all of which he has waived by failing to assert them in his district court habeas petition."); *see also Sedillo v. Hatch*, 445 F. App'x 95, 101 (10th Cir. 2011) ("Theories or claims not raised in a habeas petition are ordinarily deemed waived."). If we were to consider the argument at all, we would do so only under our plain-error standard, and we hardly think it "plain" that AEDPA is constitutionally infirm. The statute is applied daily by federal courts across the country; it is routinely applied by the Supreme Court; and no court has yet held it unconstitutional. *See Wonderly v. Franklin*, 431 F. App'x 636, 639 (10th Cir. 2011) ("[O]ur court routinely applies AEDPA, and we have never held it to be unconstitutional. The vast majority of other federal courts are in agreement with us."). And we have specifically rejected the claim, albeit in a nonprecedential decision, that AEDPA violates the separation of powers. *See Bonomelli v. Dinwiddie*, 399 F. App'x 384, 387 (10th Cir. 2010). Under plain-error review, we therefore would reject Mr. Ulrey's claim.

resolution of his claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)) (internal quotation marks omitted). This "'highly deferential standard for evaluating state-court rulings[]' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

While we review de novo the district court's legal analysis of the state-court decision, *Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011), we incorporate AEDPA's deferential treatment of that decision into our consideration of the habeas applicant's request for a COA, *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). Thus, to grant a COA, we must find that reasonable jurists could debate the district court's determination that, under AEDPA, the applicant is not entitled to habeas relief. *See Dockins*, 374 F.3d at 937.

**C. Merits**

Mr. Ulrey seeks to challenge the effectiveness of his attorney in the process culminating in his guilty plea. Traditionally, claims of ineffective assistance of counsel are analyzed under the two-part test of *Strickland v. Washington*, which requires a showing that "counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'" *Byrd*, 645 F.3d at 1167

10

(emphasis omitted) (quoting *Strickland*, 466 U.S. at 687–88) (internal quotation marks omitted).  In *Hill v. Lockhart*, 474 U.S. at 57–58, the Supreme Court held that a habeas petitioner may challenge his guilty plea on ineffective-assistance grounds and that the same two-part test of *Strickland* applies.  Thus, the petitioner must first "show that counsel's representation fell below an objective standard of reasonableness."  *Fields v. Gibson*, 277 F.3d 1203, 1215 (10th Cir. 2002) (quoting *Hill*, 474 U.S. at 57) (internal quotation marks omitted).  Second, to establish prejudice, he "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Id.* (quoting *Hill*, 474 U.S. at 59) (internal quotation marks omitted).

Under *Strickland*'s first prong, we assess counsel's performance by applying a heavy measure of deference.  *See Byrd*, 645 F.3d at 1168.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* (quoting *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994)) (internal quotation marks omitted).  To overcome that presumption, "a petitioner 'bears a heavy burden.'"  *Id.* (quoting *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000)).  In the § 2254 context, a state prisoner faces an even greater challenge because we must defer *both* to "the attorney's decision in how to best represent a client" *and* to "the state court's determination that counsel's performance was not deficient."  *Id.* (quoting *Crawley v. Dinwiddie*, 584 F.3d 916, 922 (10th Cir. 2009)) (internal quotation marks omitted).  As the Supreme Court has put it,

11

this review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

As for the second prong—prejudice—the analysis under *Hill* for challenges to a guilty plea "will closely resemble" the analysis under *Strickland* for "challenges to convictions obtained through a trial." *Hill*, 474 U.S. at 59. The gravamen of Mr. Ulrey's claim is that plea counsel did not adequately investigate the three cases comprised in his global plea agreement and did not adequately assess the availability of affirmative defenses. *Hill* offers us relevant guidance in this regard:

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change [her] recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.* Where the state court concludes that a habeas applicant was not prejudiced by counsel's errors, we owe deference to the state court's assessment under AEDPA. *See Winston v. Boatwright*, 649 F.3d 618, 625 (7th Cir. 2011).

We review seriatim the three cases in which Mr. Ulrey entered a guilty plea as part of his global plea agreement. With respect to each of them, we think reasonable jurists could not debate the district court's conclusion that Mr. Ulrey is not entitled to habeas

12

relief.[5]  We therefore deny a COA.

Because Mr. Ulrey's ineffective-assistance claims with respect to two of the cases implicate theories of self-defense and the "make my day" defense under Colorado law, we set forth up front the elements of these defenses.  The state statute pertaining to self-defense provides in pertinent part:

> (1) . . . [A] person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.
>
> (2) Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and:
>
>> (a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury . . . .

Colo. Rev. Stat. § 18-1-704.

The statute pertaining to the "make my day" defense, which is found in the next section, provides in pertinent part:

> (2) Notwithstanding the provisions of section 18-1-704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter

---

[5]     Hereinafter, we refer to the magistrate judge as the district court, and to the magistrate judge's recommendation as the district court's order.

13

how slight, against any occupant.

(3) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from criminal prosecution for the use of such force.

Colo. Rev. Stat. § 18-1-704.5.

### 1. Attempted-Assault Case

On the evening of May 13, 2001, and into the wee hours of the following morning, three individuals—Jake Kroes, Michael Blackwell, and Amanda Applehans—observed Mr. Ulrey, in a black Volkswagen Jetta, drive by their location on a residential street in Arvada, Colorado. Mr. Blackwell suspected Mr. Ulrey of stealing his uncle's vehicle and yelled to Mr. Ulrey to stop. Mr. Ulrey kept driving, but later turned around and again drove by the threesome, this time with his headlights off. Mr. Blackwell and Ms. Applehans jumped into Mr. Kroes's Ford Mustang, and the three followed Mr. Ulrey through the dark streets. A few blocks later, Mr. Ulrey executed a U-turn. As he passed the Mustang traveling in the opposite direction, he trained his handgun on the vehicle and squeezed off a single shot. A bullet lodged in the Mustang's radiator, but no one was injured. Mr. Ulrey was later charged with and pleaded guilty in the global plea agreement to attempted first-degree assault and a crime-of-violence enhancement.

Mr. Ulrey's ineffective-assistance claim with respect to this case rests on the offer of proof he made in state court. He points to seven witnesses whose statements to police or putative testimony "confirmed" that he had a "volatile relationship" with Mr.

14

Blackwell and that the three individuals in the Mustang "were chasing him with the intent to harm him." Appl. for COA at 16. Mr. Ulrey argues that plea counsel, Ms. Heller, should have followed up with these witnesses, and had she done so, she could have articulated a viable self-defense theory at trial. Ergo, he contends, Ms. Heller was ineffective for advising him to plead guilty.

The CCA rejected this claim, reasoning as follows:

> [A]ll seven witnesses were interviewed previously by an investigator hired by defendant's first defense attorney [who was retained prior to Ms. Heller]. Hence, the information they possessed was already known to both defendant and plea counsel. There is no evidence that plea counsel did not read the police reports and the investigative report provided by prior defense counsel, as defendant asserts. Further, defendant does not assert that any of these witnesses would testify differently or with information different from that which they disclosed in the interviews, even if plea counsel had personally interviewed them.
>
> Additionally, the proffered testimony of the seven witnesses only shows that defendant and one of the people in the car that defendant shot at had a volatile relationship and had experienced a recent altercation. Defendant himself was aware of the relationship and the altercation, and the statements of the witnesses would not have altered or enhanced defendant's perception of the need to defend himself.

ROA, Vol. 1, at 618–19. The CCA concluded that plea counsel was not ineffective for failing to interview the proffered witnesses and that their putative testimony "would [not] have caused defendant to proceed to trial." *Id.* at 619.

The CCA's factual findings are presumptively correct. *See* 28 U.S.C. § 2254(e). And an independent review of Mr. Ulrey's offer of proof confirms the CCA's characterization of the putative witness testimony. *See* State R., Vol. II, at 339–40. The

15

most that Mr. Ulrey can muster is that he had a volatile relationship with Mr. Blackwell and that the occupants of the Mustang intended to harm him. Neither fact, however, would justify Mr. Ulrey's use of deadly force—firing a handgun—in the circumstances. *See People v. Brown*, 218 P.3d 733, 739 (Colo. App. 2009) (discharge of firearm, even though no person was injured, was use of deadly force). Mr. Ulrey does not allege, nor is there any evidence to suggest, that he was "in imminent danger of being killed or of receiving great bodily injury." Colo. Rev. Stat. § 18-1-704(2)(a). Simply put, self-defense would have been a dubious theory at trial.

Like the CCA, we must presume that plea counsel's conduct was reasonable and represented "sound trial strategy"—or in this case, sound avoidance-of-trial strategy. *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted). Neither Mr. Ulrey's arguments nor anything in the record supplies any basis for rebutting that presumption. It appears Ms. Heller "made a strategic decision that it was not viable to pursue [a self-]defense theory," *Cummings v. Sirmons*, 506 F.3d 1211, 1225 (10th Cir. 2007), and for that reason, we conclude that the CCA reasonably rejected Mr. Ulrey's ineffective-assistance claim. We thus agree with the district court that Mr. Ulrey is not entitled to habeas relief on this ground, and we further believe that reasonable jurists would not debate this conclusion.

## 2. Drug Case

On October 2, 2001, Mr. Ulrey was riding in the passenger seat of a Chevrolet Blazer driven by his cousin, Richard Ruybal. The Blazer belonged to third parties Harold

16

and Pattie Courtney. An Arvada Police Department officer stopped the vehicle for a traffic violation and discovered that Mr. Ruybal had an outstanding arrest warrant. He took Mr. Ruybal into custody and found a loaded handgun on his person, concealed in a crotch holster. Two more officers arrived on the scene, and Mr. Ulrey was taken into custody. A loaded handgun, later found to be stolen, was discovered beneath the passenger seat where Mr. Ulrey was sitting. A search of two backpacks located in the vehicle uncovered methamphetamine and a disassembled methamphetamine lab. One of the backpacks contained Mr. Ulrey's driver's license.

Mr. Ruybal was subsequently convicted of one count of possession of a schedule II controlled substance and one count of being a special offender. He received an eight-year sentence. Thereafter, Mr. Ulrey, having been likewise charged, pleaded guilty in the global plea agreement to possession of a schedule II controlled substance and a special-offender enhancement for gun possession.

Mr. Ulrey's offer of proof with respect to this case consists of the putative testimony of five witnesses, whose statements, according to Mr. Ulrey, tend to show that the possession charge was unsubstantiated. He faults plea counsel for failing to follow up with these witnesses and failing to take account of the outcome of Mr. Ruybal's trial.

The CCA rejected Mr. Ulrey's claim. It found that the interviews of two of the proffered witnesses were provided to plea counsel and "merely showed that the backpack in which drugs were found might not have been defendant's, and that other persons had access to the vehicle besides defendant and his cousin." ROA, Vol. 1, at 619. This "was

17

consistent with the information defendant already had." *Id.* at 620. The other three witnesses "would have testified that defendant lost his wallet and was looking for it at the home of the vehicle owner and that persons other than defendant also had access to the backpacks." *Id.* This information, too, "was already known to defendant before he pleaded guilty." *Id.* The CCA further found, based on plea counsel's testimony at the Rule 32(d) hearing, that counsel adequately investigated the facts of this case and reasonably concluded that the evidence was sufficient to convict. *See id.* at 620–21. Finally, with respect to Mr. Ruybal, the CCA noted that he had been convicted of "the same counts to which defendant agreed to plead guilty" and that Mr. Ulrey "does not assert that he could have called his cousin to testify that all the weapons belonged to him, or that the cousin would voluntarily have testified." *Id.* at 621. The CCA concluded that Mr. Ulrey had failed to "assert sufficient facts to support his contention that plea counsel's investigation, on which she based her recommendation, was inadequate." *Id.*

The CCA's factual findings are presumed correct. *See* 28 U.S.C. § 2254(e). And an independent review of Mr. Ulrey's offer of proof confirms that the proffered witnesses' testimony would have been tepid at best. Rebecca Anderson would have testified that one of the backpacks belonged to Mr. Ruybal. State R., Vol. II, at 341. Daniel Courtney would have testified that one of the backpacks belonged to Mr. Ruybal and that he could not specifically identify the other as belonging to Mr. Ulrey. *Id.* at 342. Khampa Keodonexay would have testified that Mr. Ulrey lost his wallet the day before the incident and that other people had access to the backpacks. *Id.* Keith Werkheiser

18

would have testified that he helped Mr. Ulrey look for his wallet the previous day. *Id.* at 342–43. And Mr. Ulrey's mother would have testified that a month before the incident, she observed "several types of backpacks" at Daniel Courtney's apartment. *Id.* at 343. None of this evidence, however, undercuts counsel's presumptively reasonable judgment that the evidence was sufficient to convict and that it was better for Mr. Ulrey to plead guilty rather than proceed to trial. The CCA's conclusion to the same effect was not an unreasonable application of *Strickland* or *Hill*.

Mr. Ulrey points us to Mr. Ruybal's sentence of eight years, in contrast to the twenty years he received on the same charges. He contends that reasonable counsel, aware of Mr. Ruybal's shorter sentence, would not have advised him to plead guilty to a longer one. But Mr. Ulrey mistakes what happened here. He entered a *global* plea agreement, and his attorney and the prosecution agreed to a sentencing range—thirty to fifty years—that encompassed all three cases. It was the trial court that subsequently imposed a separate sentence of twenty years for the possession offense, to run concurrently with his thirty-eight-year sentence for attempted murder and his twenty-year sentence for attempted assault. The relevant question, then, is whether counsel unreasonably advised Mr. Ulrey to plead guilty to the possession charge *as part of* the global plea agreement. In that regard, nothing that Mr. Ulrey has offered suggests that counsel's recommendation was unreasonable.

Furthermore, even if that recommendation was unreasonable, Mr. Ulrey would have to establish prejudice under *Hill*. To do so, he would have to show a reasonable

19

probability that, but for counsel's erroneous advice, he would have rejected the global plea agreement—or, at least, would not have pleaded guilty to possession as part of the global plea agreement—and would have insisted on going to trial on a separate possession charge. *See Hill*, 474 U.S. at 59. But in light of Mr. Ruybal's conviction and the weak defense testimony that Mr. Ulrey proffers, the prospect of success at trial would have been dim, and we think it highly unlikely, and thus not reasonably probable, that he would have insisted on a trial in place of his guilty plea.[6]

Accordingly, we agree with the district court that the CCA's decision to reject this ineffective-assistance claim was not unreasonable and that Mr. Ulrey is not entitled to habeas relief on this ground. We further find that this conclusion is not debatable among jurists of reason.

### 3. Attempted-Murder Case

On the evening of July 11, 2002, Mr. Ulrey watched a car drive by his residence. In it were Daniel Courtney, with whom Mr. Ulrey shared a history of animosity, and Michael McClean. Although accounts differ, someone at some point shouted an expletive.[7] Mr. Courtney stopped his car and got out, and he and Mr. McClean

---

[6] In any event, the record reveals that Mr. Ulrey was well-aware, both prior to and during the plea hearing, that his guilty plea to the possession charge carried a possible sentence of eight to twenty-four years, and that the court could in its discretion sentence him to any term within that range. *See* State R., Vol. II, at 90 (Pet. to Enter Plea of Guilty, accepted Jan. 16, 2003); State R., Plea Hr'g Tr., Jan. 16, 2003, at 19–20.

[7] Mr. Courtney claimed that Mr. Ulrey shouted "Fucking pussies!" as the two drove past. State R., Presentence Report, filed Jan. 16, 2003. Bystanders claimed that
(continued...)

20

approached Mr. Ulrey's house. Mr. Ulrey was in his garage with the garage door open. He was holding a handgun. Messrs. Courtney and McClean, by contrast, were unarmed, although Mr. Ulrey asserts that he thought Mr. Courtney was armed because Mr. Courtney reached toward an ankle holster he was known to have. Mr. Ulrey fired his weapon and hit Mr. Courtney in the chest. He also fired at Mr. McClean but missed, and the latter took cover as Mr. Ulrey fled the scene.

Like the other two cases, Mr. Ulrey's ineffective-assistance claim with respect to this case rests on the offer of proof he made in state court. He points to seven witnesses whose putative testimony or statements to police, in his view, provide a strong basis for self-defense or the "make my day" defense. He argues that counsel was ineffective for failing to interview or follow up with these witnesses. In addition, he says that forensic evidence at the scene—blood spatter,[8] gunshot residue, and shell casings—bolsters the "make my day" defense because it "would have conclusively proved Dan Courtney was in Appellant's garage when he was shot." Appl. for COA at 22.

We review the CCA's treatment of this claim in the context of the proffered testimony and forensic evidence below.

    1.      Sarah Allen told police she heard Mr. Ulrey and Mr. Courtney exchange

---

[7](...continued)
Mr. Courtney yelled "Fucking midget!" (a reference to Mr. Ulrey, who is 5'5") and "You're dead, motherfucker!" from the car. State R., Vol. II, at 346–48.

[8]      Both Mr. Ulrey and the CCA vacillate between the terms "blood spatter" and "blood splatter." For consistency, we use the term "blood spatter" except where quoting from Mr. Ulrey's pleadings, the CCA's opinion, or other portions of the record.

21

words as Mr. Courtney drove past. Her observations ended there because she then went into her own house. She later heard six gunshots. *See* State R., Vol. II, at 346. The CCA found that Ms. Allen's interview "did not yield any information relevant to defendant's theories of defense." ROA, Vol. 1, at 624.

2. Richard Garrett told police he heard Mr. Ulrey and Mr. Courtney exchange words and saw Mr. Courtney approach the garage. Mr. Ulrey was holding a silver handgun; Mr. Courtney was apparently unarmed but at one point reached toward his sock and threatened to kill Mr. Ulrey. "Three feet outside the garage door," Mr. Ulrey shot Mr. Courtney. State R., Vol. II, at 348. As Mr. Garrett fled the scene, he heard three to five more gunshots. *See id.* at 346–48. The CCA highlighted plea counsel's testimony at the Rule 32(d) hearing that Mr. Garrett "was not going to be a good witness" because his statement that Mr. Ulrey was outside the garage when he fired was undercut by the forensic evidence. ROA, Vol. 1, at 623. (Shell casings from Mr. Ulrey's gun were found *inside* the garage.) The CCA also found that Mr. Garrett's statement tended to disprove the defense theories because he would have testified that Mr. Ulrey came out of the garage to shoot. *See id.* at 623–24.

3. After the incident, Mr. Courtney testified at a deposition in a civil case that he filed against Mr. Ulrey's mother. (The case was later dismissed.) Mr. Ulrey highlights three aspects of the testimony that allegedly contradicted what Mr. Courtney initially told police. At his deposition, Mr. Courtney (a) "denied any dispute with Ulrey about a missing gun," but initially told police that there was such a dispute, State R., Vol. II, at 347; (b) "testified that his reaction to having a gun pulled on him [wa]s to try to take it away," but initially told police that he "stopped walking" when he saw Mr. Ulrey's gun, *id.* at 347–49; and (c) "testified that he went to Ulrey's house as a 'novelty,' to just take McClean on a 'tour' of his old drug houses," but initially told police he went there "to confront Ulrey," *id.* at 349. The CCA noted that Mr. Courtney's original statements to police were available to plea counsel and that his later inconsistent statements surfaced only after Mr. Ulrey pleaded guilty. *See* ROA, Vol. 1, at 624–25.

4. Anesci Joan Huff told police she saw Messrs. Courtney and McClean approach the garage, "heard firecracker sounds," then saw Mr. Courtney fall. State R., Vol. II, at 349. She heard Mr. Ulrey shout, "What are you going to do now?" and watched him run inside the house. *Id.* The CCA found that Ms. Huff's statements did not "reveal any information pertinent

22

to self-defense or Make My Day." ROA, Vol. 1, at 625.

5.      Kenny Lockner lived across the street and witnessed the incident but "has now disappeared, and various efforts to find him and serve him have failed." State R., Vol. II, at 350. Mr. Ulrey's mother would have testified that Mr. Lockner said "he saw someone come out of the garage yelling he had been shot." *Id.* at 349. The CCA found that Mr. Lockner's putative testimony, although relevant to the "make my day" defense, was inadmissible hearsay; that his statement concerning Mr. Courtney's location when shot was directly contradicted by Mr. Garrett; and that nothing he said was relevant to a self-defense theory. *See* ROA, Vol. 1, at 625–26.

6.      Michael McClean told police that Mr. Courtney had consumed two or three beers that evening and became angry when he heard Mr. Ulrey shout, "Hey, you pussies!" State R., Vol. II, at 350. He and Mr. Courtney approached the garage, and he saw Mr. Ulrey raise his gun. *Id.* He heard a "pop," saw Mr. Courtney fall, and took cover as Mr. Ulrey fired at him. *Id.* The CCA found that Mr. McClean's statements were available to plea counsel and that they did not bolster Mr. Ulrey's defense theories. *See* ROA, Vol. 1, at 624.

7.      Tawni Miller (nee Ansel) visited Mr. Courtney in the hospital after the incident, and Mr. Courtney told her that he intended to kill Mr. Ulrey that evening. Mr. Courtney also told her that "he was at the threshold of the garage when he was shot." State R., Vol. II, at 351. The CCA found that Mr. Ulrey "already knew that [Mr. Courtney] had a reputation for violence, obviating the need for [Ms. Miller] to corroborate that reputation. Plea counsel testified that she and defendant discussed this in at least one of their conversations about self-defense." ROA, Vol. 1, at 623.

In his offer of proof, Mr. Ulrey also highlighted forensic evidence that he says strengthens a possible "make my day" defense. He noted that police found six .45-caliber shell casings in the garage, even though he was charged with firing only four shots. *See* State R., Vol. II, at 356. He also alleged that bullet holes were found behind the location where he was standing, "in the hood and glass of the vehicle that was parked partially in the garage," which "raises the issue that [either Mr. Courtney or Mr. McClean] was

23

armed." *Id.* Finally, he stated that neither a blood-spatter analysis nor an analysis of possible gunshot residue on the hands of Messrs. Courtney and McClean was performed. *Id.* He acknowledged that plea counsel and her investigator reviewed crime-scene photographs with the prosecution. *See id.* at 356–57. He also stated that the investigator visited the garage "and observed what appeared to be blood splatter on the north facing part of the south garage door and also what may have been blood or a right hand print on the driver side of the red vehicle parked in the garage." *Id.* at 357. However, "Ms. Heller did not follow up with tests or blood splatter analysis." *Id.*

The CCA found Mr. Ulrey's arguments concerning the forensic evidence unpersuasive, reasoning as follows:

> [A]lthough defendant contends that there were bullet holes behind where he was allegedly standing and there were more bullet holes than shots that he was charged with firing, he does not assert that any witness would testify that either of the victims actually had and discharged weapons. Additionally, defendant does not assert facts to show that [gunshot residue] testing and blood splatter analysis would support his self-defense theory, nor does he provide facts to indicate that plea counsel failed to consider these tests. Conversely, plea counsel testified at the Crim. P. 32(d) hearing that she went to the police department to look at the evidence in the cases and brought her investigator with her. She also testified she and her investigator went to defendant's garage to investigate the issue of possible blood spatter and discussed that information with the prosecutor in trying to get a better deal for defendant. Further, plea counsel testified that she was unaware whether [gunshot residue] tests were done, but it would not have made any difference in her analysis of this case.

ROA, Vol. 1, at 627–28. The CCA concluded that Mr. Ulrey failed to show that counsel gave "faulty advice" or failed to perform an adequate investigation. *Id.* at 629.

24

We conclude that the CCA did not unreasonably apply *Strickland* or *Hill*. First, nothing in the proffered witness testimony strengthens Mr. Ulrey's case for self-defense. Mr. Ulrey employed deadly force against two men approaching his house, and, as the CCA found, there is no evidence the two men were armed. Further, nothing else in the offer of proof suggests that it was reasonable for Mr. Ulrey to believe he was "in imminent danger of being killed or of receiving great bodily injury." Colo. Rev. Stat. § 18-1-704(2)(a). Finally, evidence concerning Mr. Courtney's violent proclivities was known to plea counsel based on her conversations with Mr. Ulrey, thus diminishing the need for further investigation on this front. *See Strickland*, 466 U.S. at 691 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.").

For purposes of the "make my day" defense, the most relevant statement came from Mr. Garrett, who told police that Mr. Ulrey was "[t]hree feet outside the garage door" when he shot Mr. Courtney. State R., Vol. II, at 348. This fact, if true, conclusively negates a "make my day" defense—in the context of all other evidence—because it means that Mr. Courtney was not in the garage. *See* Colo. Rev. Stat. § 18-1-704.5(2) (requiring "an unlawful entry into the dwelling"); *People v. Guenther*, 740 P.2d 971, 979 (Colo. 1987) ("[W]e hold that section 18-1-704.5 provides the home occupant with immunity from prosecution only for force used against one who has made an unlawful entry into the dwelling, and that this immunity does not extend to

25

force used against non-entrants.").[9] In contrast to Mr. Garrett's statement, Mr. Ulrey's best "make my day" evidence is the putative testimony of Mr. Lockner, who allegedly told Mr. Ulrey's mother that Mr. Courtney "c[a]me out of the garage" after being shot. State R., Vol. II, at 349. But as the CCA found, this statement could not have been introduced at trial (had there been a trial) because it is inadmissible hearsay, and Mr. Lockner has not been located.

Mr. Ulrey's defense theories fare little better under the forensic evidence that he highlights. Plea counsel investigated the crime scene and crime-scene photographs, and we presume, as we must, that she reasonably adjudged the forensic evidence insufficient to establish a viable defense theory. Mr. Ulrey has offered nothing to undermine that presumption. The bullet-hole evidence is simply too weak to call counsel's judgment into question, and as with the CCA, Mr. Ulrey points us to no facts to show that gunshot-residue testing or blood-spatter analysis would support theories of self-defense or the "make my day" defense.

---

[9] Mr. Ulrey asserts that counsel should have interviewed Mr. Garrett before the police did. He claims that Mr. Garrett's memory was "compromised by leading questions from the police investigator." Appl. for COA at 14. Mr. Ulrey points to nothing in the record that supports that assertion. Further, we are not aware of any rule of law, much less one embodied in a Supreme Court decision, that says counsel performs deficiently when she fails to interview an eyewitness before the police do.

It is true that Mr. Garrett's statement is undercut by the presence inside the garage of shell casings from Mr. Ulrey's gun. *See* State R., Rule 32(d) Hr'g Tr. at 99 (Test. of Ms. Heller). But even if Mr. Garrett's statement were untrue or disbelieved by a jury, it would say nothing about the presence of *Mr. Courtney* inside the garage, the necessary prerequisite to a viable "make my day" defense.

26

In sum, we see nothing unreasonable in counsel's advising Mr. Ulrey to plead guilty to attempted murder, and nothing unreasonable in the CCA's decision so concluding. We further find that the propriety of the district court's denial of habeas relief on this ground is not debatable among reasonable jurists.

**4. Time Spent by Plea Counsel on All Three Cases**

Mr. Ulrey wages a final assault on plea counsel's performance by arguing that she spent insufficient time—a total of 46.4 hours—on his three cases.[10] He acknowledges, however, that "there is no set standard for what amount of time is required to find [effective] representation." Appl. for COA at 12. The CCA rejected this claim, noting, "[D]efendant does not cite to any case law, nor have we found any, that requires defense counsel or an investigator to devote a specific amount of time to the investigation of a claim. Further, plea counsel was an experienced criminal defense attorney who had been practicing in that area for eighteen years." ROA, Vol. 1, at 630.

The CCA's decision was not an unreasonable application of *Strickland* or *Hill*. No doubt, "[t]he inadequacy of representation, resulting from insufficient time to prepare, is unquestionably a violation of defendant's constitutional right to the effective assistance of counsel." *United States v. Golub*, 694 F.2d 207, 220 (10th Cir. 1982). What amount of time is sufficient, however, will vary widely. *See Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) ("[C]ounsel is not required to spend any specific number of hours

---

[10] In addition to plea counsel herself, plea counsel's investigator billed 40.7 hours—10.9 hours, 4 hours, and 25.8 hours in each of the three cases, respectively.

27

preparing for trial, whether those preparations relate to investigation, witness interviews or other preparatory matters."). A full-blown criminal trial will generally require more of defense counsel than a guilty plea. Also, an attorney's level of experience is a relevant factor. Although it is incumbent upon counsel to conduct a "thorough investigation of law and facts," *Strickland*, 466 U.S. at 690, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

*Strickland*'s standard is a general one, meaning that we, on habeas review, give the CCA more leeway to reasonably adjudicate an ineffective-assistance claim. *See Byrd*, 645 F.3d at 1168. We cannot say the CCA's decision here was contrary to or an unreasonable application of clearly established federal law. No decision of the Supreme Court—"the exclusive touchstone for clearly established federal law," *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008)—sets a definitive floor on the time that reasonable plea counsel must spend in investigation, and we have not found plea counsel's performance otherwise deficient. We conclude that the district court's decision to deny habeas relief on this ground was proper and not debatable among reasonable jurists.[11]

---

[11] In his COA application, Mr. Ulrey makes several other claims of ineffective assistance of plea counsel, none of which was presented to the CCA or in his habeas application in federal district court. The claims are thus doubly barred. First, Mr. Ulrey does not argue that he "fairly present[ed]" these claims at any point to the Colorado state

(continued...)

## III. CONCLUSION

For the reasons stated, we **DENY** Mr. Ulrey's application for a COA and

**DISMISS** this matter. We nonetheless **GRANT** Mr. Ulrey's motion to proceed *in forma*

*pauperis*.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

---

[11](...continued)
courts, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)) (internal quotation marks omitted), and our own review of the record confirms that he in fact failed to do so. These claims, therefore, do not meet the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A). *See also Hernandez v. Starbuck*, 69 F.3d 1089, 1092 (10th Cir. 1995) ("A state prisoner bears the burden of showing he has exhausted available state remedies."). Furthermore, if Mr. Ulrey now sought to raise these claims in state postconviction proceedings, they may be subject to summary dismissal because Colorado prohibits successive postconviction motions under Rule 35 absent certain exceptions. *See* Colo. R. Crim. P. 35(c)(3)(VI)–(VII). Mr. Ulrey might be entitled to bring a successive Rule 35 motion on the ground that he was not represented by counsel in the first postconviction proceeding. *See Demarest v. Price*, 130 F.3d 922, 939 (10th Cir. 1997) ("The lack of counsel in post-conviction proceedings is one such special circumstance [warranting a successive Rule 35 motion under Colorado law]."). But even if the door is ajar in state court for Mr. Ulrey's claims, the claims are not properly before us because we cannot *grant* habeas relief unless an "applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006) ("Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies."). Second, even if the claims were exhausted, we would be disinclined to entertain them in light of our waiver principles because they were not presented in Mr. Ulrey's federal habeas application. *See Parker*, 394 F.3d at 1327; *Sedillo*, 445 F. App'x at 101.

29